# IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re:

| | |
|---|---|
| SOLANGE D. CHADDA, | :   **CHAPTER 11** |
| Debtor | :   **BANKRUPTCY NO. 07-12665** |

## AMENDED DISCLOSURE STATEMENT RELATED TO DEBTOR'S AMENDED PLAN OF REORGANIZATION

### A. INTRODUCTION.

On May 7, 2007, SOLANGE D. CHADDA ("the Debtor") filed a

Chapter 11 bankruptcy case in this court. David A. Scholl, Esquire filed an Application for

appointment as counsel for the Debtor on the date of the filing of this case.

This case was preceded by a Chapter 13 case filed on May 18, 2001, at Bankr. No.

01-17570 ("the 2001 Case"). When the 2001 Case was dismissed on May 22, 2002, this court

included in the dismissal order a provision requiring the Debtor to obtain court permission before

making any further bankruptcy filing ("the Permission Requirement"). On April 2, 207,

apparently unaware of the Permission Requirement, other counsel filed a Chapter 13 bankruptcy

case on behalf of the Debtor at Bankr. 07-11920. This case was summarily dismissed on April 4,

2007, because of the failure to adhere to the Permission Requirement. The Debtor also filed a a

Chapter 13 case in the Central District of California on May 28, 2002, which was dismissed on

June 19, 2002.

On May 1, 2007, the Debtor filed a motion for permission to file a new

bankruptcy case in the 2001 Case. The motion was granted on May 4, 2007, on the condition

1

that the Debtor obtain confirmation of a plan within 75 days after any new case were filed.

The Debtor filed a Plan accompanied by this Disclosure Statement on July 11, 2007, to adhere to this court's directive to promptly confirm a plan.    At an expedited hearing of July 23, 2007, to consider the approval of the Disclosure Statement, substantial portions of which the Debtor herself prepared, this court directed the Debtor to allow her counsel to file a more conventional amended Disclosure Statement, accompanying an Amended Plan, by July 30, 2007, and for a hearing to consider approval of the projected Amended Disclosure Statement on August 1, 2007.

At the hearing of August 1, 2007, the court indicated that it would enter an order stating specific further revisions to the Amended Disclosure Statement which the court deemed necessary.  This order was entered on August 7, 2007 ("the 8/7 Order"), and required that the specific items be included in a further amended Disclosure Statement which was due on August 14, 2007, which would be considered at a hearing scheduled on September 5, 2007.

On July 24, 2007, Certified Mortgage Investors, LLC ("CMI") filed a motion to dismiss this case, principally because the Debtor had not obtained confirmation within the 75-day deadline imposed by the court.  The Debtor opposes this motion, which is scheduled for a hearing on August 29, 2007, as she believes that the court has implicitly extended the deadline by establishing the schedule for refiling the Disclosure Statement.

## B.  GENERAL INFORMATION

This Disclosure Statement ("the DS") is prepared to provide all creditors of the Debtor with information relevant to the Plan. Before being circulated, it must be approved by the

2

bankruptcy court as providing adequate information about the Debtor and the Plan to parties receiving it.

As a creditor of the Debtor, your vote is important. The Plan may be confirmed by the Court if it is accepted by the holders of two-thirds (2/3) in amount and more than one half (1/2) in number of claims in each of the impaired class of claims voting on the Plan and/or if it is accepted by holders of two thirds (2/3) in amount of interest in each impaired class of equity interest holders voting on the Plan. Creditors may vote on the Plan by filling out and mailing the accompanying ballot to the Debtors' counsel. In the event the requisite acceptances are not obtained, the Court may nevertheless confirm the Plan if the Court finds that the Plan accords fair and equitable treatment under all of the circumstances of the case and existing economic circumstances to the class or classes rejecting the Plan.

Section 1125 of the Bankruptcy Code requires that the Debtor provide a DS to all creditors and equity security holders in order to provide to the holders of all such claims and interests adequate information about the Debtor and the Plan, so that they may make an informed judgment with respect to the merits of the Plan. By Order dated August 1, 2007, this DS was approved by the Bankruptcy Court as containing "adequate information" which is defined in Section 1125(a)(1) of the Bankruptcy Code as "information of a kind, and in sufficient detail, as far as reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would be a hypothetical reasonable investor typical of holders of the relevant class to make an informed judgment about the plan. . . "

This DS does not purport to be a complete description of the Plan, the financial status of the Debtor, the applicable provisions of the Bankruptcy Code or other matters that may be deemed significant by certain creditors or parties in interest. This DS is an attempt to set forth, in reasonable detail, information that will enable a creditor to make an informed judgment with respect to the Plan. Approval by the Bankruptcy Court of this DS is not an approval of the Plan. The Debtor will request confirmation of the Plan at an appropriate hearing after the DS has

been approved by the Court and transmitted to all creditors with ballots for voting. No

representations concerning the Debtor, her assets, or her financial condition are authorized by the

Debtor other than as set forth in this DS.

Enclosed with this DS are the following:

1.      A copy of the Plan, and

2.      A ballot for accept or rejecting the Plan.

The purpose of this DS is to provide creditors and other parties in interest with sufficient

information about the Debtor and the plan to permit them to intelligently cast a ballot on whether

to accept or reject the plan. Any representations or inducements made to secure your acceptance

which are other than as contained in this DS should not be relied upon by you in arriving at your

decision and any such additional representation and inducement should be reported to counsel for

the Debtor or the United States Trustee, who in turn shall deliver such information to the

Bankruptcy Court in such action as may be deemed appropriate.

The information contained in this DS has not been the subject of a certified audit.

The representations and projections made are based upon the education and business experience,

history and acumen of the Debtor. However, it should be borne in mind that economic

circumstances and "value" are subject to great fluctuation and difference of opinion and

projections for the future, and, while based upon the experience of the Debtors, are only

projections and are not guarantees.

Except for claimants holding only administrative or priority tax claims, and those

who are not entitled to vote as described below, every holder of a claim is entitled to vote to

accept or reject the Plan, provided that either: (a) its claim has been scheduled by the Debtor and

such claim is not scheduled as a disputed, contingent or unliquidated claim, or (b) it has filed a

Proof of Claim on or before the bar date to be set by the Court for filing Proofs of Claim, unless

its claim has been disallowed for voting purposes by the Bankruptcy Court. "Claim" is defined in

the Plan as " . . . a claim against the Debtor within the meaning of Section 101(4) of the

4

Bankruptcy Code."

Certain claimants are not entitled to vote on the plan. One category is that of Administrative and Priority Claims. Claimants holding only administrative claims and/or priority claims are not entitled to vote on the Plan because Section 1123(a)(1) of the Code does not require that such claims be designated in a Class and because the Plan provides for the full payment of such claimants under terms which not only satisfy, but are more favorable to such claimants than the requirements of Sections 1129(a)(9)(A) and (C) of the Code. Sections 1122(a) and 1123(a)(1) of the Code require that the Plan designate Classes of claims, other than administrative claims and priority claims, and that each Class consist of substantially similar claims. Although she was not required to do so under the Code, the Debtor have elected to designate a Class of priority claims and a Class of administrative claims.

Another category of claims not entitled to vote are Unimpaired Claims. Claimants holding claims in a Class which is not impaired (as discussed below) are not entitled to vote on the Plan because pursuant to Section 1126(f) of the Code a Class that is not impaired under the Plan, and each claimant in such Class, is conclusively presumed to have accepted the Plan. As a general matter, under Section 1124 of the Code, a Class of claims is impaired unless the rights of the claimants in such Class are not altered by the Plan (with exception of certain rights of claimants to receive accelerated payment of their claims and certain rights of Debtors to cure defaults) or unless the Plan provides, that, on the effective date, each claimant in such Class shall receive, on account of its claim, cash equal to the allowed amount of such claim. The only Class of claims whichis not impaired in the instant Plan is Class1 which is administrative claims.

The Plan is deemed accepted by a Class of creditors when it is approved by creditors who hold at least two-thirds of the dollar amount, and who comprise more than one-half in number of, the allowed claims of such Class that are held by creditors and who in fact vote. An abstention by a creditor will not count toward either acceptance or rejection of the Plan.

The Debtor recommends that each voter ACCEPT the Plan. IN ORDER FOR

5

YOUR VOTE TO COUNT, YOUR BALLOT MUST BE COMPLETED AND RECEIVED AT

THE ADDRESS STATED ON THE BALLOT BY THE DATE SET FORTH ON THE

BALLOT. Tele-faxed Ballots are acceptable if followed up with a hard copy within three days.

Ballots are to be sent to the following address:

> DAVID A. SCHOLL, ESQUIRE
> 6 St. Albans Avenue
> Newtown Square, PA.  19073
> Fax No.:  610-353-7542

Even though a creditor may not choose to vote or may vote against the Plan, the

creditor will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by

the requisite majorities in each Class of creditors and is confirmed by the Court.  Allowance of a

claim for voting purposes does not necessarily mean that the claim will be allowed for purposes

of distribution under the terms of the Plan.  Any claim to which an objection has been or shall be

made will be allowed for purposes of distribution only after determination by the Court.  Such

determination may be made after the Plan is confirmed.

Should you have an objection to confirmation of the Plan, it must be filed, in

writing, with the Bankruptcy Court and served on counsel for the Debtor, on or before a date

which will be established by the court.  Thereafter, the court will schedule a hearing  to consider

confirmation of the Plan.  The judge assigned to this case is the Honorable Bruce Fox, United

States Bankruptcy Judge, United States Bankruptcy Court, 900 Market Street, Philadelphia,

Pennsylvania 19107.

The Debtor is seeking confirmation of the Plan under Section 1129(a) of the

6

Bankruptcy Code. Confirmation under Section 1129(a) is dependent upon a finding of the

Bankruptcy Court that a number of requirements have been met. One of these requirements is

that each impaired class of claims must have accepted the Plan. Accordingly, the Plan cannot be

confirmed under Section 1129(a) unless accepted by each impaired class of claims. While the

Debtor intends to seek confirmation of the Plan under Section 1129(a), the Debtor reserves the

right to seek confirmation of the Plan under Section 1129(b), notwithstanding non-acceptance by

one or more Classes of impaired claims.

Under Section 1129(b)(1) of the Code, the Court may confirm the Plan even if it

has not been accepted by one or more impaired Classes of claims, provided that the Plan does not

discriminate unfairly, is fair and equitable with respect to each impaired Class of claims that has

not accepted the Plan, and is accepted by at least one impaired class.

In order for the Plan to be fair and equitable with respect to an impaired Class of

secured claims, Section 1129(b)(2)(A) of the Code requires that the Plan provide for each

claimant in such Class: (a) to receive payments over time which, in the aggregate, total at least

the allowed amount of such claimant's Claim, and which have a present value, as of the effective

date of the Plan, at least equal to the value of such claimant's interest in the Debtors' property

encumbered by such claimant's lien(s); and (b) shall retain such lien(s) in order to secure such

payments.

In order for the Plan to be fair and equitable with respect to an impaired Class of

unsecured claims, Section 1129(b)(2)(B) of the Code requires, in certain cases, that the Plan

comply with the so-called "absolute priority rule" by providing either: (a) that each claimant in

such Class shall receive on account of its claim payments which have a present value, as of the

effective date of the Plan, equal to the allowed amount of such claim; or (b) that no claimant or

7

holder of an interest in Debtors' property that is junior to the claims of such impaired Class will receive or retain under the Plan on account of such junior claim or interest any property until the unsecured creditors are paid in full. This court has held that, In an individual Chapter 11 Case, the absolute priority rule requires that the Debtor pay all claims which have rejected the plan in full before the Debtor may retain any property, even exempt property. The Debtor's schedules as described below indicate that she has significant non-exempt property. The Debtor is making very substantial payments to unsecured creditors and it is therefore urged by the Debtor that all such creditors will vote for this plan to be confirmed. In fact, in light of the operation the "absolute priority rule," it may be critical to confirmation that unsecured creditors vote for the plan.

> THE ACCURACY OF THE INFORMATION, PARTICULARLY FINANCIAL INFORMATION, SUBMITTED WITH THIS DISCLOSURE STATEMENT IS DEPENDENT UPON INFORMATION OBTAINED FROM THE DEBTOR AND/OR ITS AUTHORIZED REPRESENTATIVES. WHILE EVERY EFFORT HAS BEEN MADE TO PROVIDE THE MOST ACCURATE INFORMATION AVAILABLE, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT ALL INFORMATION IS WITHOUT INACCURACY. NO KNOWN INACCURACIES ARE INCLUDED. FURTHER, MUCH OF THE INFORMATION CONTAINED HERE MAY CONSIST IN WHOLE OR IN PART OF DETERMINATIONS OF THE VALUE OF ASSETS, WHICH IS SUBJECT TO THE DIFFERENCES OF OPINION.

> WHILE EVERY EFFORT HAS BEEN MADE TO ENSURE THAT THE ASSUMPTIONS ARE VALID AND THAT THE STATEMENTS MADE HEREIN ARE AS ACCURATE AS CAN BE MADE UNDER THE CIRCUMSTANCES.

### C. THE DEBTOR

The Debtor was born on April 9, 1954, and is therefore 53 years old at present. She attended universities in France, including the Sorbonne. She is fluent in four languages; French is her first language, and she also speaks English, German, and Spanish.

The Debtor has been a journalist and an entrepreneur for most of her professional

8

life. In her youth, she composed songs and wrote books. The last song she did was for her own radio show in Philadelphia, WNWR 1540 AM, in the last nineties called "Together." She continues to receive royalties for these compositions.

Thereafter, the Debtor became involved in the world of fashion. She is a pioneer of the large sizes, and she introduced high fashion design for the American large sizes at moderate prices. She manufactured her own label "Solange" for the largest retailers in this country such as Bloomingdale's, Macy's, Mervyn's, Popular Club catalogue, Women's World, Montgomery Ward, Lane Bryant, The Limited Group with its subsidiaries, Forgotten Wome., One of her first customers was Stevie Wonder. She designed also for many other celebrities, such as Patti Austin, who modeled her clothes on the runway of New York and the opening of Bloomingdale's in Chicago, where also Karl Largefeld flew in from Paris to be a guest of Honor. She also manufactured clothes for little girls at Nordstrom, which were sold through the country. Solange was respected in the world of fashion.

Next, she decided to open her own line of perfumes and cosmetics. "Solange n9" which she has developed her own private clientele at the present time and sells them on a regular basis. The first "Solange N9" unisex products were marketed at the same time Calvin Klein put out similar products on the market at the opening at the Marshall Field in Chicago. There was an endorsement of Solange N9 by her friend Dorothy Hamill, and through other major retailers such as Saks Fifth Avenue and Nordstrom.

The Debtor also had her own radio show "Live with Solange" and did some segments for Pax TV. She was also the co-chair of the American Society for the Special Gala in Philadelphia in the late nineties.

In 2006, with a group of friends, she decided to design her own line of wines made in California which will be marketed in the fall of 2007 in California first, then nationwide. Her new products on this line are Solange Merlot, Solange Chardonnay and Solange Cuvee of Champagne, which will bring more revenue monthly in the fall of 2007.

The Debtor also intends to become the pioneer of the "Solange Low Carb gourmet on wheels," which would feature two lunch trucks, starting on September 26, 2007, and which will thereafter expand to include catering.

The Debtor also plans to rent the property at 507 North Highland Avenue, Los Angeles CA. 90036 ("the Property"). She believes that the rental of the main house, the bedroom, and the gardens which will raise revenues of not less than $9,000.00/month. The Debtor has delayed because her broker was intimidated and harassed by vandals who broke the sign and the gate. Because of this problem the Debtor is securing the property. By the early fall the Property will be rented, including the guest bedroom, which has already been rented, and the gardens.

The Debtor receives at present time monies from translation a nd also income from sales of perfumes and rental of the properties owned by her mother in France which is a total amount of $11,000.00/month.

The Debtor's financial difficulties arose because of her inability to previously refinance the mortgage on the Property held by CFI, which required a balloon payment in November, 2005. CFI scheduled the Property for a Trustee Sale on May 9, 2007, and it was necessary to file this case to prevent the sale of the Property.

The 8/7 Order required that the Debtor disclose a summary of her income as reported to the Internal Revenue Service and the Commonwealth of Pennsylvania from 2004 through 2006, and to address any "inconsistencies" between the this disclosure statement and her filed bankruptcy documents.   The Debtor has filed all returns with these taxing authorities for the years in question, as well as with the State of California. A summary of this information is attached hereto as Exhibit "A," which includes a one-page Summary for all three years and more detailed summaries from all returns for 2006 and 2005, and, on separate sheets, for 2004. In her Amended Statement of Financial Affairs, she estimated her income from employment in 2006 at $80,000 and other income at $130,000.  Her income from employment for that year was actually

10

$74,000 and other income was $102,000. In her Amended Statement of Financial Affairs, she estimated her income from employment in 2005 at $92,000 and other income at $140,000. Her income from employment for that year was actually $80,000 and other income was $144,000. These differences are not great and are explained by the fact that the tax returns were not completed when the Amended Statement of Financial Affairs was filed.

### D. THE PLAN

The classes established in the Plan and their respective treatment are as follows:

Class 1- - Priority Claims other than tax claims. The only claim in this Class is the claim for compensation and reimbursement of costs of the Debtor's counsel, David A. Scholl, Esquire; for services performed in connection with this case. This claim will be paid in full and this class is not impaired, as are all of the following classes. It is estimated that this claim will be $25,000.

Class 2 -- The claim of CMI, secured by a first mortgage on the Property. This claim was filed in the amount of $1,043,697.20. This claimant will be paid $825,000 from the proceeds of a loan to refinance the Property and a balance of not more than $220,000 liquidated in payments of $2560.00/month in 120 installments at a market rate of interest of 7.05%. The Debtor may have to object to the claim of CMI to properly fix the amount due to this creditor. If the financing plan proposed by the Debtor is not acceptable, the Debtor will use her income to make payments to creditors while she obtains another financing proposal. In this event, the Debtor projects payments of $10,000/month for three months and $20,000/month thereafter.

Class 3 - - The claim of Los Angeles County ("LAC") for delinquent real estate taxes against the Property, which is secured by a lien on the Property, which is in the amount of $16,000. This claim will be paid in full upon the occurrence of the refinancing in a lump sum,

11

with all penalties due, within 90 days after confirmation of a plan.

Class 4 - - The claims of Security Union Title Insurance Co. ("Security") and University

of Pennsylvania Small Animal Hospital ("Penn") (from which the Debtor has taken an appeal),

which are allegedly secured by judicial liens against the Property.  These claims are filed in the

amounts of $87,068.72 and $3777.56, respectively.  The Debtor contends that over $22,000 was

paid on this debt to Security and $1000 was paid to Penn.  There will therefore be objections

filed to these claims.  They will be paid 75% of the amount allowed from the proceeds of the

refinanced loan within 90 days after confirmation of a plan or, if not paid from the loan proceeds,

paid the total amount allowed, estimated to be $77,000, in payments of approximately

$900/month at a market rate of interest at 7 %.

Class 5 -- The priority portions of  the tax claims of the Internal Revenue Service ("the

IRS") and the Pennsylvania Department of Revenue ("PADOR").  The Debtor has filed tax

returns which greatly reduce the priority amount on the IRS' proof of claim, alleged to be

$93,600, to $30,545.58.  If the claim filed is not adjusted, an objection to same will have to be

filed.  The Debtor has filed tax returns which greatly reduce the priority amount on PADOR's

prrodf of claim, alleged to be $28,081.69, to $2523.00.  To the extent that such claims allowed

are not paid from the proceeds of the refinancing, these claims shall be paid in equal monthly

installments, within five years from the date of the filing of the petition, with interest accruing at

the statutory rate and using the statutory compounding method set forth in 26 U.S.C. sections

6621 and 6622, respectively, and applicable state law as to PADOR's claims.  Various

protections required by the IRS are also recited in the plan.

Class 6 -- All general unsecured claims, which are filed and ultimately allowed. Like

12

Class 4 claims, these claims will be paid 75% of the amount allowed within 90 days after

confirmation of a plan or payment over 120 months in inmstallments. Apart from unsecured

claims of the IRS and PADOR, which are believed to total no more than $10,000, these claims

total $20,751.37. These claims will be paid 75% of the amount allowed from the proceeds of the

refinanced loan within 90 days after confirmation of a plan or, if not paid from the loan proceeds,

paid the total amount allowed, estimated to be $30,000, in payments of approximately

$350/month at a market rate of interest at 7 %.

        The Plan will be effected by a refinancing of the Debtor's obligation to CMI. A

transaction describing a proposed loan from More 2 Lend was described in the Debtor's previous

Amended Disclosure Statement. Unfortunately, on August 1, 2007, Mr. Shamblen, the principal

of CMI, contacted Joe Moore of More 2 Lend and made certain statements which Mr. Moore

took as a threat and which rendered him unwilling to continue with the transaction. The Debtor

has now approached Charles Grubb of Diamond Point Lending, 2 North Lake Ave., Suite 1030,

Pasadena, CA. 91101, and Mr. Grubb is now working on putting together a loan with essentially

the same terms as the transaction proposed by More 2 Lend. The proposed Loan Amount

remains $1,040,000, of which $825,000 would be paid to CMI in a lump sum and the balance

would be utilized for costs of the loan, and payments to the IRS and PADOR and a significant

amount towards payments to other creditors, which it is hoped will be sufficient, after claims

objections to claims are resolved, to constitute enough to make all payments due under the plan

except the additional payments due to CMI. In order to make this loan, Mr. Grubb has requested

that CMI agree to release its first-lien position upon receipt of the $825,000 and for this court to

require him to do so, if the Debtor so moves.

The Debtor also has several sources of income.  These include the following amounts on a monthly basis:

| | |
|---|---|
| Employment as a translator | $2000 |
| Sales of perfumes, wines | $2000 |
| Rentals from properties in France | $7000 |
| Rentals from 507 N. Highland Ave. | $9000 |
| Projected Income from Lunch Truck | $20,000 |

Most of these figures are consistent with the Debtor's Schedules.  The Schedule "I" statement of rents was intended to include the rentals from the French properties, which has consistently been $7000/month, and rentals actually received at that time from rental of the Property, which were at that time estimated at $2000/month.  The Debtor anticipates that rentals from the Property will increase as she rents it out.  Also, income from the lunch truck business was not mentioned in Schedule "I" because that business had not yet commenced.  In fact, it will not commence until September 26, 2007, when the Debtor's step-father will provide start-up funds of $40,000 for this business.

The total of gifts received by the Debtor are the rentals from properties in France, which are titled in her mother.  The total of these amounts for 2004 through 2006 was $7000/month or $84,000/year.

The 8/7 Order requested historical information about the sources of funding and certain information relating to any new businesses the income form which the Debtor would utilize to fund the plan.  Income from translations and sales of perfume are set forth in the Debtor's tax returns.  The history of the rental of the Property is as follows.  In 2004 the Property

14

was rented to Beth Holden for $2000/month, and this rental realized income of $24,000. The

lease for this rental cannot be located, although three pages of correspondence relating to theis

lease are attached here as part of Exhibit "B." In 2005 the Property was presented to Qualiti and

Tracy Taylor for $5000/month pursuant to a Lease attached hereto as part of Exhibit "B." The

Taylors paid the rent through August, 2005, but thereafter gave the Debtor bad checks for rent for

which they were ultimately convicted and ordered to pay restitution of $18,000. The income

received in 2005 was therefore $40,000. In 2006, a squatter moved into the Property and it could

not be rented. Presently, the Debtor is offering the Property for rent and has obtained an initial

Residential Lease for one of six bedrooms in the Property at $1500/month beginning in

September, attached hereto as Exhibit "C." The receipts for payments for rent and a security

deposit from this tenant will be available after the tenancy begins on September 15, 2007.

Attached as Exhibit "D" is a listing of the Property with the UCLA Community Housing Office.

The Debtor also plans to fund the plan in part from the proceeds of two new

businesses as described herein, although she is also considering involvement in a third new

business, which is a proposed riding academy involving a number of horses. The two businesses

which are further developed are the sale of a line of "Solange" wines and the establishment of a

business which will operate two lunch trucks and a catering operation.

The wine sale business is a venture involving the Guglielmo Winery, 1480 East

Main Ave., Morgan Hill, CA. 95037, which is a manufacturer of wines which has already

produced 48 cases of wine for this project; Peter Kerr, a long-time friend of the Debtor who is

presently working as a wine broker and is administering this venture; the Akbar Restaurant, 44

North Fair Oaks Ave., Pasadena, CA. 91103, which has a liquor license and will receive and sell

the wines wholesale; and the Debtor. The three wines to be sold are Solange Merlot, Solange

Chardonnay, and Solange Cuvee of Champagne. This venture will not have any employees other

than the above participants. This venture will commence on October 1, 2007. The anticipated

share of the Debtor of the profits is projected at one-fourth of the total net profits, or

$2000/month. The preliminary business plan for this venture is attached hereto as Exhibit "E."

The lunch truck business will operate from two locations, one in the vicinity of

the California Mart, which is located in the Downtown Garment District of Los Angeles, CA.,

and the other on or near the campus of UCLA. The trucks will be parked at the ranch at which

the riding academy will be conducted when not in operation. In addition, a related catering

business will be established in the vicinity of Warner Brothers studio, located in Burbank, CA.

The start-up operations of the business will be funded by a $40,000 gift from the Debtor's step-

father, as described in t a note attached hereto as Exhibit "F." The business will commence on

September 26, 2007. As explained in a preliminary business plan attached hereto as Exhibit "G,"

the proposed employees are two cooks, to be paid $2000/month, an administrator who will be

paid $3000/month, and a marketing and operations manager who will be paid $4000/month. It is

projected that the income from this business will be not less than $20,000/month.


## E. LIQUIDATION ANALYSIS

The Debtor's principal assets arise from the Property and include her equity in the

Property estimated between $200,000 and $1 million. The estimate of the value of the Property

is based on appraisal by Kevin Taylor of "Think ASAP" valuing the Property at $1,515,000 as of

January 10, 2007. In addition, she has oil rights in the Property which she estimates at $5 million

as the result of an oral contact with Chevron Oil Company.

16

Other property interests held by her include antiques, jewelry, and inventory of her Solange perfume products. The antiques include the following: a Voltaire Chair valued at $100,000.00; two Voltaire Arm Chairs, valued at $80,000.00; A Louis XV Love Seat valued at $25,000.00; an original Napoleon library valued at $35,000.00; and an original Napoleon Bar valued at $45,000.00. The jewelry consists of the following loose stones: two Rutilated Quartz valued at $26,000.00; three (3) Imperial Topaz valued at $30,000.00; an Arizona Peridot valued at $5,000.00; a Red Diamond valued at $1,000.00; a Blue Diamond valued at $5,000.00; fifteen (15) Garnets valued at $1,500.00; seven (7) Yellow Beryl valued at $14,000.00; three (3) Pink Tourmeline valued at $3,000.00; and ten (10) Blue Topaz valued at $500.00. The inventory of Solange, Inc. includes one thousand (1000) bottles of Solange N9 valued at $85,000.00; one thousand (1000) refills of Solange N9 valued at $50,000.00; four thousand (4000) bottles of Solange N9 Lotion valued at $200,000.00; one thousand (1000) bottles of Solange N9 Bath Gel valued at $40,000.00; and one thousand (1000) pairs of Solange N9 Sun Glasses valued at $25,000.00.

It is doubtful that a Trustee would attempt to sell the inventory or stock of Solange, Inc., and it is unclear whether a Trustee could expect to recover anything close to the market value stated for the antiques and stones. Further, it is doubtful that a Trustee in Pennsylvania would attempt to sell real estate in California, let alone oil rights. In light of the small number of unsecured creditors involved, approximately $20,000, a Trustee would probably consider efforts to sell this property not worth the costs and would abandon all of these assets, in which case the unsecured creditors would not receive any dividend. When the transactional costs of sales and the administration costs are considered, it is highly unlikely that a Chapter 7 liquidation would result in a greater dividend that the 75% amount proposed to be paid to unsecured creditors, with interest if payment is delayed, under the provisions of the plan.

17

Therefore, the Debtor believes that it is unlikely that a Chapter 7 liquidation would result in a greater dividend than the amounts which she proposes to pay to unsecured creditors under the terms of the plan.

Dated:  August 14, 2007

_____
DAVID A. SCHOLL
6 St. Albans Avenue
Newtown Square, PA.  19073
610-353-7543
Fax 610-353-7542
Attorney for the Debtor

Ms. Solange Chadda
410 S. 47th Street
Philadelphia, PA 19143

Re: Your Personal Tax Returns

Dear Solange:

You have requested that I prepare a letter summarizing your income an
Blue Sky's income for the years 2004, 2005, and 2006.

_Solange Chadda Personal_

| | 2004 | 2005 | 2006 |
|---|---|---|---|
| TOTAL : GIFTS AND NON GIFTS | $153,790 | $224,000 | $176,000 |
| ROYALTIES RECEIVED | $ 37,000 | $56,000 | $30,000 |
| RENTS RECEIVED | $ 32,790 | $ 60,000 | $ 18,000 |
| Translation | $ -0- | $ 24,000 | $ 44,000 |
| Gifts | $ 84,000 | $ 84,000 | $ 84,000 |

_Blue Sky Resorts and Spas, Inc._

| | 2005 |
|---|---|
| Perfume sales | $ 12,000 |
| INVESTMENT | $(100,500) |

EXHIBIT "A"   (7 pgs.)

[*]

| | 2006 | 2005 | DIFF |
|---|---|---|---|
| **INCOME** | | | |
| BUSINESS INCOME | 43,124 | 23,124 | 20,000 |
| RENT, ROYALTY, PARTNERSHIP, SCORP, TRUST | 5,000 | 31,000 | -26,000 |
| TOTAL INCOME | 48,124 | 54,124 | -6,000 |
| **ADJUSTMENTS TO INCOME** | | | |
| ONE-HALF OF SELF-EMPLOYMENT TAX | 3,047 | 1,634 | 1,413 |
| TOTAL ADJUSTMENTS | 3,047 | 1,634 | 1,413 |
| ADJUSTED GROSS INCOME | 45,077 | 52,490 | -7,413 |
| **ITEMIZED DEDUCTIONS** | | | |
| TAXES | 3,135 | 497 | 2,638 |
| MISCELLANEOUS (SUBJECT TO 2% OF AGI) | 0 | 4,950 | -4,950 |
| TOTAL ITEMIZED DEDUCTIONS | 3,135 | 5,447 | -2,312 |
| **TAX COMPUTATION** | | | |
| STANDARD DEDUCTION | 5,150 | 5,000 | 150 |
| LARGER OF ITEMIZED OR STANDARD DEDUCTION | 5,150 | 5,447 | -297 |
| INCOME PRIOR TO EXEMPTION DEDUCTION | 39,927 | 47,043 | -7,116 |
| EXEMPTION DEDUCTION | 3,300 | 3,200 | 100 |
| TAXABLE INCOME | 36,627 | 43,843 | -7,216 |
| TAX BEFORE CREDITS | 5,714 | 7,621 | -1,907 |
| **CREDITS** | | | |
| TOTAL CREDITS | 0 | 0 | 0 |
| TAX AFTER CREDITS | 5,714 | 7,621 | -1,907 |
| **OTHER TAXES** | | | |
| SELF-EMPLOYMENT TAX | 6,093 | 3,267 | 2,826 |
| TOTAL TAX | 11,807 | 10,888 | 919 |
| **PAYMENTS** | | | |
| CREDIT FOR FEDERAL TELEPHONE EXCISE TAX | 30 | 0 | 30 |
| TOTAL PAYMENTS | 30 | 0 | 30 |
| **REFUND OR AMOUNT DUE** | | | |
| UNDERPAYMENT PENALTY | 559 | 437 | 122 |
| LATE FILING PENALTY | 1,060 | 2,450 | -1,390 |
| LATE PAYMENT PENALTY | 118 | 762 | -644 |
| INTEREST | 159 | 1,275 | -1,116 |
| AMOUNT YOU OWE | 13,673 | 15,812 | -2,139 |
| **TAX RATES** | | | |
| MARGINAL TAX RATE | 25.0% | 25.0% | 0.0% |
| EFFECTIVE TAX RATE | 32.2% | 24.8% | 7.4% |

CLIENT'S COPY

## PENNSYLVANIA INCOME TAX SUMMARY

| | 2006 | 2005 | DIFF |
|---|---|---|---|
| **INCOME** | | | |
| NET PROFITS FROM BUSINESS OR FARM.......... | 43,124 | 23,124 | 20,000 |
| RENT, ROYALTIES, AND COPYRIGHTS............ | -102,553 | -65,350 | -37,203 |
| PENNSYLVANIA GROSS TAXABLE INCOME.......... | 43,124 | 23,124 | 20,000 |
| PENNSYLVANIA NET TAXABLE INCOME............ | 43,124 | 23,124 | 20,000 |
| | | | |
| TAX.................................... | 1,324 | 710 | 614 |
| | | | |
| **REFUND OR AMOUNT DUE** | | | |
| PENALTIES AND INTEREST.......................... | 209 | 280 | -71 |
| AMOUNT YOU OWE.................................... | 1,533 | 990 | 543 |
| | | | |
| **TAX RATES** | | | |
| MARGINAL TAX RATE................................. | 3.1% | 3.1% | 0.0% |
| EFFECTIVE TAX RATE............................... | 3.1% | 3.1% | 0.0% |

CLIENT'S COPY

CALIFORNIA INCOME TAX SUMMARY

| | 2006 | 2005 | DIFF |
|---|---|---|---|
| **FEDERAL ADJUSTED GROSS INCOME** | | | |
| FEDERAL ADJUSTED GROSS INCOME............... | 45,077 | 52,490 | -7,413 |
| **CALIFORNIA SUBTRACTIONS** | | | |
| NET OPERATING LOSS CARRYOVER................ | 25,000 | 0 | 25,000 |
| TOTAL SUBTRACTIONS FROM FEDERAL AGI....... | 25,000 | 0 | 25,000 |
| **ADJUSTED GROSS INCOME** | | | |
| ADJUSTED GROSS INCOME......................... | 20,077 | 52,490 | -32,413 |
| **ITEMIZED DEDUCTIONS** | | | |
| FEDERAL ITEMIZED DEDUCTIONS................... | 3,135 | 5,447 | -2,312 |
| LESS STATE, LOCAL AND FOREIGN TAXES....... | 3,135 | 497 | 2,638 |
| CALIFORNIA ITEMIZED DEDUCTIONS............. | 0 | 4,950 | -4,950 |
| CALIFORNIA STANDARD DEDUCTION.............. | 3,410 | 3,254 | 156 |
| **TAX COMPUTATION** | | | |
| TOTAL TAXABLE INCOME............................ | 16,667 | 47,540 | -30,873 |
| TAX......................................... | 288 | 2,386 | -2,098 |
| CALIFORNIA ADJUSTED GROSS INCOME........... | -50,000 | -25,000 | -25,000 |
| CALIFORNIA SOURCE TAX RATE RATIO........... | 1.73% | 5.02% | -3.29% |
| NET TAX........................................ | 0 | 0 | 0 |
| **PAYMENTS** | | | |
| CALIFORNIA INCOME TAX WITHHELD.............. | 0 | 0 | 0 |
| TOTAL PAYMENTS.................................. | 0 | 0 | 0 |
| **REFUND OR AMOUNT DUE** | | | |
| AMOUNT OVERPAID................................. | 0 | 0 | 0 |
| AMOUNT YOU OWE.................................... | 0 | 0 | 0 |
| **TAX RATES** | | | |
| MARGINAL TAX RATE................................ | 4.0% | 9.3% | -5.3% |

CLIENT'S COPY

## PERSONAL INCOME TAX SUMMARY

**INCOME**
RENT, ROYALTY, PARTNERSHIP, SCORP, TRUST......................................... 12,000
TOTAL INCOME................................................................................ 12,000

**ADJUSTMENTS TO INCOME**
TOTAL ADJUSTMENTS................................................................... 0
ADJUSTED GROSS INCOME............................................................. 12,000

**ITEMIZED DEDUCTIONS**
TAXES......................................................................................... 284
TOTAL ITEMIZED DEDUCTIONS....................................................... 284

**TAX COMPUTATION**
STANDARD DEDUCTION................................................................. 4,850
LARGER OF ITEMIZED OR STANDARD DEDUCTION............................... 4,850
INCOME PRIOR TO EXEMPTION DEDUCTION....................................... 7,150
EXEMPTION DEDUCTION................................................................ 3,100
TAXABLE INCOME......................................................................... 4,050
TAX BEFORE CREDITS................................................................... 408

**CREDITS**
TOTAL CREDITS............................................................................ 0
TAX AFTER CREDITS...................................................................... 408

**OTHER TAXES**
TOTAL TAX.................................................................................. 408

**PAYMENTS**
TOTAL PAYMENTS......................................................................... 0

**REFUND OR AMOUNT DUE**
LATE FILING PENALTY.................................................................... 100
LATE PAYMENT PENALTY................................................................ 55
INTEREST.................................................................................... 22
AMOUNT YOU OWE....................................................................... 585

**TAX RATES**
MARGINAL TAX RATE..................................................................... 10.0%
EFFECTIVE TAX RATE.................................................................... 10.1%

CLIENT'S COPY

## PENNSYLVANIA INCOME TAX SUMMARY

**INCOME**
RENT, ROYALTIES, AND COPYRIGHTS...................................................... -44,223
PENNSYLVANIA GROSS TAXABLE INCOME.................................................... 0
PENNSYLVANIA NET TAXABLE INCOME...................................................... 0

TAX................................................................................. 0

**REFUND OR AMOUNT DUE**
AMOUNT YOU OWE....................................................................... 0

**TAX RATES**
MARGINAL TAX RATE................................................................... 0.0%

CLIENT'S COPY

**FEDERAL ADJUSTED GROSS INCOME**
    FEDERAL ADJUSTED GROSS INCOME..................................................... 12,000

**ADJUSTED GROSS INCOME**
    ADJUSTED GROSS INCOME............................................................ 12,000

**ITEMIZED DEDUCTIONS**
    FEDERAL ITEMIZED DEDUCTIONS....................................................... 284
    LESS STATE, LOCAL AND FOREIGN TAXES............................................... 284
    CALIFORNIA ITEMIZED DEDUCTIONS..................................................... 0
    CALIFORNIA STANDARD DEDUCTION...................................................... 3,165

**TAX COMPUTATION**
    TOTAL TAXABLE INCOME............................................................... 8,835
    TAX............................................................................... 115
    CALIFORNIA ADJUSTED GROSS INCOME.................................................. -25,000
    CALIFORNIA SOURCE TAX RATE RATIO................................................... 1.30%
    NET TAX........................................................................... 0

**PAYMENTS**
    CALIFORNIA INCOME TAX WITHHELD..................................................... 0
    TOTAL PAYMENTS..................................................................... 0

**REFUND OR AMOUNT DUE**
    AMOUNT OVERPAID.................................................................... 0
    AMOUNT YOU OWE..................................................................... 0

**TAX RATES**
    MARGINAL TAX RATE.................................................................. 2.0%

CLIENT'S COPY

# Barton Myers Associates, Inc. Architects, Planners

**To:**   **Solange Chadda**
          408 South 47th Street
          Philadelphia, Pa. 19143
**Tel.:**   **215.474.4594**
**Fax:**   **215.474.7711**

**From:** Beth Holden
**Date:**  28 October 2002

**1 Page & Lease Document**

**Re:**   **507 N. Highland Avenue, Los Angeles, Calif. 90036**

Dear Solange,

Please find enclosed the signed Lease Document and a money order in the amount of $1,000.00 dollars. As agreed, I will send the remainder of $4,000.00 6 November 20002.

I hope that your pneumonia is cured and that you are feeling better. Best wishes for a wonderful week.

Sincerely,

Beth Holden
Associate
b_holden@bartonmyers.com

EXHIBIT "B" ( 7 pgs.)

08/13/02  07:02am  P. 005
OCT 25 2002 13:42 FR BARTON MYERS ASSOC 310 208 2207 TO 12154717711,540   P.02

## Barton Myers Associates, Inc. Architects, Planners

I am very happy with the way that we have begun our Tenant/Landlord relationship; I appreciate your communicating and being straightforward with me. I look forward to see this relationship develop and grow.

Best Regards,

Beth Holden
Associate
b_holden@bartonmyers.com

*every rent of each month, will be paid on 3rd of each month, 3rd morning, 3rd eastern time, by money orders on cashier checks, up to convenience to tenants and send by Fedex, Fedex (paid by owner, owner will provide her number).*

*the 1,000 on monday 28th agreed to fedex for 28th morning delivery east coast on october.*

Signature

Solange Chooden
oct 28/2002

Beth Holden
28/10/02

** TOTAL PAGE.02 **

# Barton Myers Associates, Inc. Architects, Planners

| | | | |
|---|---|---|---|
| **To:** | **Solange Chadda** | **From:** | Beth Holden |
| | 408 South 47th Street | **Date:** | 12 December 2002 |
| | Philadelphia, Pa. 19143 | | |
| **Tel.:** | 215.474.4594 | | |
| **Fax:** | 215.471.7711 | **1 Page** | |

**Re:** 507 N. Highland Avenue, Los Angeles, Calif. 90036

## Residential Lease 4th Amendment

**Item 1:** lessee agrees to furnish security code to Owner when established, in case of an emergency.

**Item 2:** Owner may bring the Police into the house before this weekend, as we have planned to begin to clean and prepare the house this weekend, as agreed to prior.

**Item 3:** Please find attached a letter of "verification of employment" from my employer.

**Item 4:** My husband will send a letter of verification of employment to you and will furnish you with his Social Security Number as soon as it is issued to him.

Best Regards,

Beth Holden
Associate
b_holden@bartonmyers.com

1025 Westwood Boulevard, Los Angeles, California 90024  phone 310 208 2227  fax 310 208 2207

OCT.25.2004   1:05PM                                          08/12/07 11:28am P. 005
                                                             NO.165  P.2

CALIFORNIA
ASSOCIATION
OF REALTORS®

**LEASE LISTING AGREEMENT**
EXCLUSIVE AUTHORIZATION TO LEASE OR RENT
(C.A.R. Form LL, Revised 4/03)

1. **EXCLUSIVE RIGHT TO LEASE:** _Solange Chaama_ ("Owner")
   hereby employs and grants _Real Estate Access Inc_ ("Broker")
   beginning (date) _10/21/04_ and ending at 11:59 P.M. on (date) _03/21/05_ ("Listing Period")
   the exclusive and irrevocable right to lease or rent the real property in the City of _____
   County of _Los Angeles_, California, described as _____ ("Premises").

2. **LISTING TERMS:**
   A. RENT AMOUNT: _Five Thousand_ Dollars $ _5,000_ per _Month_
   B. TYPE OF TENANCY: (Check all that apply): ☐ Month-to-Month; ☐ One year; ☒ Other _Rent_
   C. ITEMS INCLUDED IN LEASE/RENTAL: All fixtures and fittings attached to the Premises and the following items of personal
      property: _____

   D. ITEMS EXCLUDED FROM LEASE/RENTAL: ☐ Garage/Carport; ☐ ___  _2 months security deposit_
   E. ADDITIONAL TERMS: _____

3. **COMPENSATION:**
   Notice: The amount or rate of real estate commissions is not fixed by law. They are set by each Broker
   individually and may be negotiable between Owner and Broker (real estate commissions include all
   compensation and fees to Broker).
   A. Owner agrees to pay to Broker as compensation for services, irrespective of agency relationship(s):
      (1) For fixed term leases:
         (a) Either (i) ☒ _8_ percent of the total rent for the term specified in paragraph 2 (or if a fixed term lease is executed,
             of the total base payments due under the lease); or (ii) ☐ ___
         (b) Owner agrees to pay Broker additional compensation of ___
             if a fixed term lease is executed and is extended or renewed. Payment is due upon such extension or renewal.
      (2) For month-to-month rental: either (i) ☐ ___ percent of ___  _Not Applicable_
      (3) The following terms apply whether the tenancy is for a fixed term or month-to-month:
         (a) If Broker, cooperating broker, or any other person procures a Tenant who offers to lease/rent the Premises on the above
             amount and terms, or on any amount and terms acceptable to Owner during the Listing Period, or any extension thereof;
         (b) If Owner, within ___ calendar days after the end of the Listing Period or any extension thereof, enters into a
             contract to transfer, lease or rent the Premises to anyone ("Prospective Transferee") or that person's related entity:
             (i) who physically entered and was shown the Premises during the Listing Period or any extension thereof by Broker
             or a cooperating broker; or (ii) for whom Broker or any cooperating broker submitted to Owner a signed, written offer
             to lease or rent the Premises. Owner, however, shall have no obligation to Broker under this sub-paragraph 3A(3)(b)
             unless, not later than 3 calendar days after the end of the Listing Period or any extension, Broker has given Owner a
             written notice of the names of such Prospective Transferees.
         (c) If, without Broker's prior written consent, the Premises are withdrawn from lease/rental, are leased, rented or
             otherwise transferred, or are made unmarketable by a voluntary act of Owner during the Listing Period or any extension.
      B. If commencement of the lease or rental is prevented by a party to the transaction other than Owner, then compensation due
         under paragraph 3A shall be payable only if and when Owner collects damages by suit, arbitration, settlement or otherwise,
         and then in an amount equal to the lesser of one-half of the damages recovered or the above compensation, after first
         deducting title and escrow expenses and the expenses of collection, if any.
      C. In addition, Owner agrees to pay: ___
      D. Broker may retain compensation due from any Tenant payments collected by Broker.
      E. Owner agrees to pay Broker directly or indirectly acquires, or enters into an agreement to acquire title to Premises or
         any part thereof, whether by sale, exchange or otherwise, during the term or any extension of tenancy, as follows:
         compensation shall be equal to ___ percent of selling price or total consideration in said transfer, whichever is greater.
         Payment is due upon Tenant's direct or indirect acquisition of any legal or equitable interest in Premises and, if there is an
         escrow, shall be through escrow.  _The house is not for sale Never_
      F. Broker is authorized to cooperate with and compensate other brokers in any manner acceptable to Broker.
      G. (1) Owner warrants that Owner has no obligation to pay compensation to any other broker regarding the lease or rental of
             Premises unless the Premises are leased or rented to:
         (2) If Premises are leased or rented to anyone listed in 3G(1) during the time Owner is obligated to compensate another
             broker: (i) Broker is not entitled to compensation under this Agreement, and (ii) Broker is not obligated to represent Owner
             with respect to such transaction.

4. **TENANT PAYMENTS:** Broker is authorized to accept and hold from a prospective Tenant a deposit to be held uncashed,
   or deposit in Broker's trust account. Upon execution of a fixed-term or month-to-month lease, payments received from Tenant
   shall be given to Owner or ☐ ___  _Not applicable see clause 4_

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized
reproduction of this form, or any portion thereof, by photocopy machine or any other
means, including facsimile or computerized formats. Copyright © 1993-2003,
CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.
LL REVISED 4/03 (PAGE 1 OF 3)   Print Date BDC Apr 03

X Owner's Initials ( ___ )
  Broker's Initials ( ___ )

Reviewed by ___ Date ___

EQUAL HOUSING OPPORTUNITY

OWNER'S COPY

_Clause_
_4 The tenants paid directly the owner_
_every month by cashier check via Federal_
_Express need to be arrived on the first of_
_each month at 408 South 47th Street Philadelphia PA 19104_

08/12/02  11:28am  P. 006

Case 07-12665-bif   Doc 62   Filed 08/14/07   Entered 08/14/07 19:59:27   Desc Main
OCT.25.2004 1:05PM   507  No  Document   Page 30 of 45   NO.165   P.3

Date: 10-15-04

5. **KEYSAFE/LOCKBOX:** ☐ (If checked) Owner authorizes the use of a keysafe/lockbox to allow entry into the Premises and agrees to sign a keysafe/lockbox addendum (C.A.R. Form KLA). *the owner will change the keys*

6. **SIGN:** (If checked) ☐ Owner authorizes Broker to install a FOR LEASE sign on the Premises. *on the premises and*

7. **MULTIPLE LISTING SERVICE:** Information about this listing will (or ☐ will not) be provided to a multiple listing service(s) ("MLS") *system* of Broker's selection. All terms of the transaction will be provided to the selected MLS for publication, dissemination and use by *also a* persons and entities on terms approved by the MLS. Seller authorizes Broker to comply with all applicable MLS rules. MLS rules *with* allow MLS data to be made available by the MLS to additional Internet sites unless Owner gives the MLS instructions to the contrary. *if used*

8. **SECURITY AND INSURANCE:** Owner agrees: (i) Broker is not responsible for loss of or damage to personal or real property *code* or person, whether attributable to use of a keysafe/lockbox, a showing of the Premises, or use of the Premises during any resulting tenancy; (ii) to take reasonable precautions to safeguard, protect or insure valuables that might be accessible during showings of the Premises; and (iii) to obtain insurance to protect against these risks. Broker does not maintain insurance to protect Owner.

9. **OWNERSHIP, TITLE AND AUTHORITY:** Owner warrants that: (i) Owner is the legal owner of the Property; (ii) no other persons or entities have title to the Property; and (iii) Owner has the authority to both execute this contract and lease or rent the Property. Exceptions to ownership, title and authority: _____

10. **LEAD-BASED PAINT DISCLOSURE:** The Premises ☐ were, ☐ were not, constructed prior to 1978. If the Premises were constructed prior to 1978, Owner is required to complete a federally mandated and approved lead-based paint disclosure form and pamphlet, which shall be given to Tenant prior to or upon execution of a lease or rental agreement.

11. **OWNER REPRESENTATIONS:** Owner represents that Owner is unaware of: (i) any recorded Notice of Default affecting the Premises; (ii) any delinquent amounts due under any loan secured by, or other obligation affecting, the Premises; (iii) any bankruptcy, insolvency or similar proceeding affecting the Premises; (iv) any litigation, arbitration, administrative action, government investigation, or other pending or threatened action that does or may affect the Premises or Owner's ability to transfer it; and (v) any current, pending or proposed special assessments affecting the Premises. Owner shall promptly notify Broker in writing if Owner becomes aware of any of these items during the Listing Period or any extension thereof.

12. **BROKER'S AND OWNER'S DUTIES:** Broker agrees to exercise reasonable effort and due diligence to achieve the purposes of this Agreement. Unless Owner gives Broker written instructions to the contrary, Broker is authorized to advertise and market the Premises in any medium, including the Internet (e-commerce), selected by Broker and, to the extent permitted by these media, including MLS, control the dissemination of the information submitted to any medium. Owner agrees to consider offers presented by Broker and to act in good faith to accomplish the lease or rental of the Premises by, among other things, making the Premises available for showing at reasonable times and referring to Broker all inquiries of any party interested in the Premises. Owner is responsible for determining at what price and terms to list and lease or rent the Premises. Owner further agrees, regardless of responsibility, to indemnify, defend and hold Broker harmless from all claims, disputes, litigation, judgments and attorney fees arising from any incorrect information supplied by Owner, whether contained in any document, omitted therefrom or otherwise, or from any material facts that Owner knows but fails to disclose.

13. **AGENCY RELATIONSHIPS:**

A. **Disclosure:** If the Premises includes residential property with one-to-four dwelling units, and the listing is for a tenancy in excess of one year, Owner acknowledges receipt of the "Disclosure Regarding Agency Relationships" form (C.A.R. Form AD). *only with*

B. **Owner Representation:** Broker shall represent Owner in any resulting transaction, except as specified in paragraph 3G. *the*

C. **Possible Dual Agency With Tenant:** Depending upon the circumstances, it may be necessary or appropriate for Broker to act as an agent for both Owner and Tenant. Broker shall, as soon as practicable, disclose to Owner any election to act as a dual agent representing both Owner and Tenant. If a Tenant is procured directly by Broker or an associate licensee in Broker's firm, Owner hereby consents to Broker acting as a dual agent for Owner and such Tenant.

D. **Other Owners:** Owner understands that Broker may have or obtain listings on other properties, and that potential tenants may consider, make offers on, or lease or rent through Broker, premises the same as or similar to Owner's Premises. Owner consents to Broker's representation of owners and tenants of other properties before, during and after the end of this Agreement.

E. **Confirmation:** If the Premises includes residential property with one-to-four dwelling units, and the agreed-upon lease is for a tenancy in excess of one year, Broker shall confirm the agency relationship described above, or as modified, in writing, prior to or coincident with Owner's execution of such lease.

14. **EQUAL HOUSING OPPORTUNITY:** The Premises is offered in compliance with federal, state and local anti-discrimination laws.

15. **ATTORNEY FEES:** In any action, proceeding or arbitration between Owner and Broker regarding the obligation to pay compensation under this Agreement, the prevailing Owner or Broker shall be entitled to reasonable attorney fees and costs from the non-prevailing Owner or Broker, except as provided in paragraph 19A.

16. **ADDITIONAL TERMS:** ☐ Keysafe/Lockbox Addendum (C.A.R. Form KLA); ☐ Lead-Based Paint and Lead-Based Paint Hazards Disclosure (C.A.R. Form FLD) _____

~~17. MANAGEMENT APPROVAL: If a salesperson or broker-associate enters this Agreement on Broker's behalf, and Broker/Manager does not approve of its terms, Broker/Manager has the right to cancel this Agreement, in writing, within 5 days after its execution.~~

18. **SUCCESSORS AND ASSIGNS:** This Agreement shall be binding upon Owner, and Owner's successors and assigns.

*am no longer using; my trust/account in Europe will take care of Rey*

X _____ Owner's Initials ( S.P. )( )
Broker's Initials ( )( )

Copyright © 1993-2003, CALIFORNIA ASSOCIATION OF REALTORS®, INC.
LL REVISED 4/03 (PAGE 2 OF 3)

Reviewed by _____ Date _____

*At the time of signing the tenant will make 2 cashier's checks one for Rey one for the owner the tenants will send by Federal Express the owner's check to the address in Philadelphia directly, Rey doesn't...*

OCT.25.2004 1:06PM '07 No HIGHLAND AVE LA, CA          NO.165 — P.4
Date: 10-15-04

**19. DISPUTE RESOLUTION:**

**A. MEDIATION:** Owner and Broker agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to arbitration or court action. Paragraph 19B(2) below applies whether or not the Arbitration provision is initialed. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party commences an action without first attempting to resolve the matter through mediation, or refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action. THIS MEDIATION PROVISION APPLIES WHETHER OR NOT THE ARBITRATION PROVISION IS INITIALED.

**B. ARBITRATION OF DISPUTES:** (1) Owner and Broker agree that any dispute or claim in law or equity arising between them regarding the obligation to pay compensation under this agreement, which is not settled through mediation, shall be decided by neutral, binding arbitration, including and subject to paragraph 19B(2) below. The arbitrator shall be a retired judge or justice, or an attorney with at least 5 years of residential real estate law experience, unless the parties mutually agree to a different arbitrator, who shall render an award in accordance with substantive California Law. The parties shall have the right to discovery in accordance with Code of Civil Procedure § 1283.05. In all other respects, the arbitration shall be conducted in accordance with Title 9 of Part III of the California Code of Civil Procedure. Judgment upon the award of the arbitrator(s) may be entered in any court having jurisdiction. Interpretation of this agreement to arbitrate shall be governed by the Federal Arbitration Act.

(2) EXCLUSIONS FROM MEDIATION AND ARBITRATION: The following matters are excluded from mediation and arbitration hereunder: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage, or installment land sale contract as defined in Civil Code § 2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; and (iv) any matter that is within the jurisdiction of a probate, small claims, or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver of the mediation and arbitration provisions.

"NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."

"WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."

Owner's Initials _____    Broker's Initials _____

**20. TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the parties are incorporated in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed except in writing. This Agreement and any supplement, addendum or modification, including any copy, may be signed in two or more counterparts, all of which shall constitute one and the same writing.

Owner acknowledges Owner has read, understands, accepts and has received a copy of this Agreement.

Owner SOLANGE CHANDRA                                    Date 10/15/04
Print Name
Address 408 SOUTH 47th Street City Philadelphia    Social Security/Tax ID # (for tax reporting purposes)
Telephone 215 476 1714 Fax _____    State PA Zip 19143
                                                        E-mail

Owner _____                  Date _____
Print Name
Address _____ City _____    Social Security/Tax ID # (for tax reporting purposes)
Telephone _____ Fax _____    State _____ Zip _____
                                                        E-mail

Real Estate Broker (Firm) REAL ESTATE ACCESS INC    Date 10/15/04
By (Agent) RAY FAULNEY
Address 21731 VENTURA BLVD #116 City Woodland Hills    State CA Zip 91364
Telephone (818)264 1633    Fax (818)264 1580    E-mail REACCESS2@NETZERO.

THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

SURE TRAC
The System for Success™

Published by the
California Association of REALTORS®

LL REVISED 4/03 (PAGE 3 OF 3)

Reviewed by _____ Date _____

**OWNER'S COPY**
LEASE LISTING AGREEMENT

need Full
Signature on
amendment to
be VALID

10-26-04   11:57am   From-Kinko's Studio City   T-611   P.002/002   F-849

## APPLICATION TO RENT AND
## RENTAL DEPOSIT AND APPLICATION SCREENING FEE
CALIFORNIA ASSOCIATION OF REALTORS (C.A.R.) STANDARD FORM

Application to rent property at: 542 Highland

Full name of applicant: Grant Taylor
Phone: 505 562-6932   Date of birth: 1/25/68
Present address: 11220 Moorpark St
City/State/Zip: N Hollywood
Name of current landlord/manager: Alan Graliatti
Landlord/manager's phone: 312 943-2844
How long at present address: 4 yrs + 2 years
Reason for leaving: need bigger space for family
List prior address(es), landlord/manager's name(s), phone number(s), and length of tenancy: N/A lived with parents Bev wife and 1

Co-applicant/spouse: Tracy Taylor
Phone: 818 762-8899   Date of birth: 05/05/68
Present address: 11220 Moorpark Street
City/State/Zip: N Hollywood
Name of current landlord/manager: Alan Graliatti
Landlord/manager's phone: (713) 763-6444
Reason for leaving: need bigger space for family

Name(s) of all other occupant(s) and relationship to applicant: Wife - Tracy   2 sons - Julien + Jonathan + daughter Julia   Mom

An application to rent is required for any occupant 18 years of age or over.
Applicant: Soc. Sec. No. C652247?   Drivers license no. C652247?   State CA   Expires 11/05
Present employer: Salt England N   Supervisor: Self   How long with this employer:
Employer's address: Zankoth trunk   City: Pike sharg. com   Zip   Phone (323) 281-0351
Position or title: Manager/Owner   Gross income $ 3,???   per month
Other income $ 3000.00   per   Source: Disability
Auto make: Oldsmobile   Model: Silhouette   Year: 99   License no. 6HOX65   State CA   Color Beige
If present employment is less than one year, list immediate prior employment information: No License, then Car

In case of emergency, person to notify: Catherine Taylor   Relationship: mother
Address: 9306 Wilshire Blvd #919   City: Bev Hills   Zip: 90212   Phone: 323 397-7634
Co-applicant: Soc. Sec. No. 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   Drivers license no. C6652769   State: CA   Expires: CA
Present employer: Self-employed   Supervisor: Self   How long with this employer: 3 years
Employer's address: 11220 Moorpark Stu#17   City: NH   Zip: 91602   Gross income $ 80000   per mth
Income $   per   Source
Auto: Oldsmobile   Model: Silhouette   Year: 99   License no.   State: CA   Color: Beige
If employment is less than one year, list immediate prior employment information

gency, person to notify: Catherine Taylor   Relationship: mother in law
Blvd #919   City: Bev Hills   Zip: 90212   Phone: 323 397-7634
plan to use your listed furniture? No ☐ Yes ☒ Type: 2 fish tanks
been a party to an unlawful detainer action or filed bankruptcy within the last seven years? No ☒ Yes ☐

| of creditor | Account number | Monthly payment | Balance due |
|---|---|---|---|
| x Time | 101013264?-81 | $446.00 | 10,000 |

| mation | | | |
| bank | Address/branch | Account number | Type of Account |
|---|---|---|---|
| Wamu | 12223 Ventura Bl | 02457-05723 | Checking |
| Amex | 5028 Lankershim Blvd NH CA | 00586-03987 | Checking |

cupied only by the person(s) named in this application. Applicant(s) represent(s) the above information to be true and complete, verification of the information provided, Applicant(s) agree(s) to execute a lease or rental agreement and understand(s) that the any such agreement for any misrepresentation in this application.
Applicant(s)   Date 10/16/04   Time 9:00p   Co-applicants Tracy Taylor
(eve) (818) 782-7662   Phone (day) (818) 281-5891   (eve) 1618 1782-6992

posited the sum of Mone   Dollars $   payable
☐ Cashier's Check, ☐ Personal Check, ☐ or   , to be held uncashed until approval of the application to rent, as deposit
as a monthly rent of $
lation to rent is not approved within   days, this deposit shall be returned to applicant(s). If approved, the ☐ month-to-
month lease, or ☐ other   shall commence an   (date).
Mone

### TOTAL SUMS DUE PRIOR TO OCCUPANCY

| | | |
|---|---|---|
| Rent for the period   is | $ | |
| Security deposit (not applicable toward last month's rent) | $ | |
| Other | $ | |
| Other | $ | |
| Total | $ | |
| Less amount received above | $ | |
| Balance due, on or before   (date) | $ | |

In addition, applicant(s) has/have paid a screening fee of $   applied as follows: $   for credit report(s);
$   for   (other out-of-pocket expenses) and $   for processing. The undersigned has/have read
the foregoing and acknowledge(s) receipt of a copy.

Applicant   12/26/04   Co-applicant   10/26/04

THIS STANDARDIZED DOCUMENT HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS...
A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS...
This form is available for use by the entire real estate industry...
The copyright laws of the United States (17 U.S. Code) forbid the...

OFFICE USE ONLY

Social the blue one
usually
561355301
Social   C6652768
102546571

# RESIDENTIAL LEASE

This Lease is made on _____ , between _SOLANGE CHADDA_ , Landlord, of

_507 NORTH HIGHLAND AV_ , City of _LOS ANGELES_ , State of _CALIFORNIA_ , and

_CHRISTOPHE BELLINI_ , Tenant, of _SOLANGE CHADDA FOR 507 NORTH_

City of _HIGHLAND AVENUE_ , State of _LOS ANGELES_ , HANCOCK PARK CA9003

1. The Landlord agrees to rent to the Tenant and the Tenant agrees to rent from the Landlord the following ~~residence~~: _THE GUEST BEDROOM FOR $1500 amonth Located at 507 NORTH HIGHLAND Avenue, HANCOCK PARK, LOS ANGELES CA 90036_

2. The term of this Lease will be from _SEPT 15/2007_ , until _SEPT 15/2008_

3. The rental payments will be $ _1500_ per month and will be payable by the Tenant to the Landlord on the _15_ day of each month, beginning on _SEPTEMBER 15 2007_

4. The Tenant has paid the Landlord a security deposit of $ _1,500_ . This security deposit will be held as security for the repair of any damages to the residence by the Tenant. This deposit will be returned to the Tenant within ten (10) days of the termination of this Lease, minus any amounts needed to repair the residence, but without interest, except as required by the Laws of the State of _California_ .

5. The Tenant has paid the Landlord an additional month's rent in the amount of $ _1,500_ . This rent security deposit will be held as security for the payment of rent by the Tenant. This rent security deposit will be returned to the Tenant within ten (10) days of the termination of this Lease, minus any rent still due upon termination, but without interest, except as required by the Laws of the State of _California_ .

6. The Tenant has inspected the residence and has found it satisfactory. Tenant agrees to maintain the residence and the surrounding outside area in a clean and sanitary manner and not to make any alterations to the residence without the Landlord's written consent. At the termination of this Lease, the Tenant agrees to leave the residence in the same condition as when it was received, except for normal wear and tear.

7. Tenant also agrees not to conduct any type of business in the residence, nor store or use any dangerous or hazardous materials. Tenant agrees that the residence is to be used only as a single family residence, with a maximum of _1_ tenants. Tenant also agrees to comply with all rules, laws, and ordinances affecting the residence, including all applicable provisions of the Laws of the State of _California_ . Tenant agrees that no pets or other animals are allowed in the residence without the written permission of the Landlord.

8. The Landlord agrees to supply the following utilities to the Tenant: _diswasher, stove, refrigeraton bed, a common computer w/ internet in the Living room all roomates, Available for the tenants in highland, ustensie for a modern kitchen_

9. The Tenant agrees to obtain and pay for the following utilities: _the tenant will pay his phone, his computer, his cable (TV) his cellule_

10. The Tenant agrees not to sub-let the residence or assign this Lease without the Landlord's written consent. Tenant agrees to allow the Landlord reasonable access to the residence for inspection and repair. Landlord agrees to enter the residence only after notifying the Tenant in advance, except in an emergency.

11. If the Tenant fails to pay the rent on time or violates any other terms of this Lease, the Landlord will provide written notice of the violation or default. If the violation or default is not corrected, the Landlord will have the right to terminate this lease in accordance with state law. The Landlord will also have the right to re-enter the residence and take possession of it and to take advantage of any other legal remedies available including under all applicable provisions of the Laws of the State of _California_ .

12. If the Tenant remains as tenant after the expiration of this Lease without signing a new lease, a month-to-month tenancy will be created with the same terms and conditions as this Lease, except that such new tenancy may be terminated by thirty (30) days written notice from either the Tenant or the Landlord.

_EXHIBIT "B" (2 pgs)_

13. As required by law, the Landlord makes the following statement: "Radon gas is a naturally-occurring radioactive gas that, when accumulated in sufficient quantities in a building, may present health risks to persons exposed to it. Levels of radon gas that exceed federal and state guidelines have been found in buildings in this state. Additional information regarding radon gas and radon gas testing may be obtained from your county health department."

14. As required by law, the Landlord makes the following LEAD WARNING STATEMENT: "Every purchaser or lessee of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular threat to pregnant women. The seller of any interest in residential real estate is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspection in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase."

LANDLORD'S DISCLOSURE

Presence of lead-based paint and/or lead-based paint hazards: (Landlord to initial one).

_____ Known lead-based paint and/or lead-based paint hazards are present in building (explain).

_____ Landlord has no knowledge of lead-based paint and/or lead-based paint hazards in building.                *NA*

RECORDS AND REPORTS AVAILABLE TO LANDLORD: (Landlord to initial one).

_____ Landlord has provided Tenant with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards that are present in building (list documents).

_____ Landlord has no records and reports pertaining to lead-based paint and/or lead-based paint hazards in building.    *NA*

TENANT'S ACKNOWLEDGMENT (Tenant to initial all applicable).

_✗_ Tenant has received copies of all information listed above.

_✗_ Tenant has received the publication "Protect Your Family from Lead in Your Home."

_✗_ Tenant has received a 10-day opportunity (or mutually-agreed on period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards in building.    *he has done*

_✗_ Tenant has waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards in building.

The Landlord and Tenant have reviewed the information above and certify, by their signatures at the end of this Lease, to the best of their knowledge, that the information they have provided is true and accurate.

15. This Lease may only be terminated by __*30*__ days written notice from either party.

16. The following are additional terms of this Lease:    *NO CRIMINAL RECORDS, NO DRUG OR DRUG ACTIVITY IN HIGHLAND, will be eviction WITH LAPD THE SAME DAY - GOOD CREDIT*

17. The parties agree that this lease is the entire agreement between them and that no terms of this Lease may be changed except by written agreement of both parties. This Lease is intended to comply with any and all applicable laws relating to landlord and tenant relationships in the State of __*CALIFORNIA*__. This Lease binds and benefits both the Landlord and Tenant and any successors, representatives, or assigns. This Lease is governed by the laws of the State of __*CALIFORNIA*__.

_____    _____
Signature of Landlord    Signature of Tenant
*July 28 / 2007*    *19 B Rue du Bel Air
2100 Dijon France*
Name of Landlord    *SOLANGE DITER CHADDA*    Name of Tenant    *July 28 / 07*

Notice to California Residents: The California Department of Justice, sheriff's departments, police departments serving jurisdictions of 200,000 or more and many other local law enforcement authorities maintain for public access a data base of the locations of persons required to register pursuant to paragraph (1) of subdivision (a) of Section 290.4 of the Penal Code. The data base is updated on a quarterly basis and a source of information about the presence of these individuals in any neighborhood. The Department of Justice also maintains a Sex Offender Identification Line through which inquiries about individuals may be made. This is a "900" telephone service. Callers must have specific information about individuals they are checking. Information regarding neighborhoods is not available through the "900" telephone service.

 **msn** • Hotmail®

anchor45@hotmail.com                                          Printed: Friday, August 3, 2007 3:37 PM

| From : | <cho@ha.ucla.edu> |
| Sent : | Wednesday, August 1, 2007 11:38 PM |
| To : | anchor45@hotmail.com |
| Subject : | UCLA Community Housing Office Listing Approved |

**UCLA Community Housing Office**

**UCLA Community Housing Office, 360 De Neve Drive, Los Angeles, CA 90095-1495**
**Phone: (310) 825-4491 Fax: (310) 825-0262 Email: www.housing.ucla.edu/ask**

Dear Sheryl Ramirez,

Thank you for advertising with the UCLA Community Housing Office. Below is a copy of your listing as it appears on our website. Please review your listing. If you would like to edit your listing, please log into the CHO database using your account information and select your listing in the "Account Activity" section. Please note that all listing changes are subject to UCLA Community Housing Office approval. You may also track the number of hits your listing has received, view your listing as searched, or deactivate your listing from the "Account Activity" menu. Once posted, your listing will be active for 30 days. After 30 days, you may use your account information to renew your listing. As a courtesy to our renters, please remove your listing once it has been rented. If you need further assistance, please feel free to contact our office and reference your listing ID number: **428152** as a reference.
Sincerely,

**Hilary Crocker**
**Thomas Hertha**
UCLA Community Housing Office
Click here to log into CHO Database.

**Here is your listing**

Pictures:

Picture 1

Picture 2

Picture 3

Picture 4

Picture 5

Picture 6

Notes:
Pet deposit of $ 500.00 required. Located in Handcock Park(The best of Los Angeles)First month plus 1 month security = $3000.00 per bedroom.Lease length is negotiable.

Personal Information

| First Name | Last Name | Listing Date: Date Needed | | Expiration Date |
| Sheryl | Ramirez | 08/01/2007 | | 09/01/2007 |
| | * Your name will be anonymous | Amenities | | |
| Phone Number | Alt. Number | Utilities Included | | |
| 951-333-5666 | 951-333-5666 | Laundry | Parking | |
| Email | Fax Number | Room | Garage | |
| anchor45@hotmail.com | | | | |
| Listing Information | | Wheelchair Access: | University Owned | |
| Maximum Tenants | Housing Type | no | Apt.: | |
| 6 | House | | no | |
| Address | | Smoking Allowed: | Furnished: | Near Bus Line: |
| 507 North Highland Ave | | no | no | no |
| Los Angeles,CA 90036 | | | | |
| Listing Type | Neighborhood | Air Conditioning: | Carpet: | Window Coverings: |
| faculty | Los Angeles | no | no | no |
| Rent | Deposit | Hardwood Floors: | Tile Floors: | Fireplace: |

EXHIBIT "D" (3 pgs.)

08/13/03    07:02am    P. 003
Page 2 of 2

| 1500.00 | 3000.00 | yes | yes | yes |
|---|---|---|---|---|
| **Lease Minimum (in months)** | **Lease Maximum (in Months)** | **Balcony:** | **Patio:** | **Garbage Disposal:** no |
| 1 | 0 | yes | no | |
| **Bedrooms** | **Bathrooms** | **Stove:** | **Refridgerator:** | **Dishwasher:** |
| 1 | 1.00 | yes | yes | yes |
| **Total Bedrooms in House** | **Total Bathrooms in House** | **Yard:** | **Fenced Yard:** | **Gardener Included:** |
| 6 | 2.000 | yes | no | no |
| **Distance to UCLA** | | **Pets Allowed:** | **Cats Allowed:** | **Dogs Allowed:** |
| 4 | | yes | no | yes |
| | | **Pool:** | **Jacuzzi:** | **Additional Storage:** |
| | | no | yes | no |


WINES STARTING POINT SEPT 30th 2007

INVESTMENT STOCK
FIRST SHIPPMENT

4 people giving birth to solange n9 wines

   1) the Winery
Guglielmo ,morgan Hill California
1480 East Main Avenue,Morgan hill Ca
(family winery since 1925)

   2)Peter Kerr (Peter Kerr was in fashion in los angeles and her little girl were modeling
solange clothes at Nordstrom and solange and Peter got together,and Peter left the fashion
business to go into the wine business,His wife Pamela designed the labels

   3)Solange choose the wines and approve the labels

   4) AK-BAR restaurant a friend of Peter Kerr (Avi the owner has many restaurants and
LA and his licence can receive wines wholesale)

In the prices structures of solange wines,Peter Kerr and AkBar are included as part of the
Team.

See Akbar purchase order

Peter Sheet Solange Wine work sheet

Winery

All these details make solange merlot,solange chardonnay and solange cuvee of
champagne as part of disclosure.

Preliminary
(the cpa was going in vacations,he didn't have the time to do the business but he will do
so for the Court early September 2007)

How to distribute the wines as a premier stock

Through restaurant in los angeles as part of wine tasting,Peter Kerr will put solange in
Touch with restaurant which will agree to do wine tasting with her line.
They will charge their clientele and using their mailing list for the wine tasting,the profit
After expenses paid will go to solange.
That day of the wine tasting,the clientele can buy a bottle or a case of solange 's wines

EXHIBIT "E" ( 5 pgs.)

Which will be sold retail under Akbar licence.

Solange has found a nationwide distributor in Florida,when she was at a meeting in
Washington DC and they will distribute in different states through their channels and
Solange will ship directly from the winery.


See Prices list
See Projections of the solange wines

Solange wines non only will benefit of a smooth advertising through the restaurant in los
angeles,to be known through connoisseurs and food and wines industry but also she
Will benefit of some press articles such as food and wine,bon appetit and los angeles
Times.Coming 2008,through the nationwide channel.solange can octuple her profits
In the time frame of 12 months after the first launch in September 30th 2007,which will
Increase of her revenues monthly.



# Guglielmo
MORGAN HILL · CALIFORNIA

FAMILY WINERY · SINCE 1925

Wine Tasting
Gourmet Food & Gift Shop
Villa Emile Event Center

408-779-2145
1480 East Main Ave. · Morgan Hill, CA
www.guglielmowinery.com

"SOLANGE" WINE WORK SHEET.

WINE : PRIVATE RESERVE MERLOT      per CASE 150⁰⁰ (12.50
        "      "   CHARDONNAY   "   "   150⁰⁰ (12.50
CAL. GRAND CUVEE CHAMPAGNE   "   "   85⁰⁰ (7⁰⁸
$5390 PAYABLE TO AKBAR RESTAURANT.

SHIPPING : 1ˢᵗ SHIPMENT CHARD/MERLOT  [INCL.]
        "    : 2ᴺᴰ  "    CAL. CHAMPAGNE  (      )!
        "    : FUTURE SHIPMENTS TO BE DETERMINED) (    )!

STORAGE : 3 MONTHS (LA) @ 75/mo     225⁰⁰ (o.u
           PAYABLE TO AVINASH KAPOOR

ONE TIME CHARGES :
LABEL DESIGN    200⁰⁰ (AMY KERR)
COMMISSION 10%  539⁰⁰ (PK/AVI)

# *Akbar*

**Purchase Order**

44 N. Fair Oaks Ave.
Pasadena, CA 91103
Phone: 1-310-466-7355
Email: peterkerr@verizon.net

| To: | Ship To: | Purchase Order #: | Akbar01 |
|---|---|---|---|
| **Guglielmo Winery** | Information to follow | Date: | 11/20/06 |
| **1480 E. Main Ave.** | | | |
| **Morgan Hill, CA 95037** | | | |

## "Solange" Private Label Order

| Req By | Ship When | Ship Via | FOB | Buyer | Terms | Tax ID |
|---|---|---|---|---|---|---|
| PK | ASAP | | | | | ABC# 41-336562 |

| Quantity | Item | Units | Description | Taxable | Unit Price | Total |
|---|---|---|---|---|---|---|
| 14 | | case | Solange Private Reserve Merlot | | $150.00 | $2,100.00 |
| 14 | | case | Solange Private Reserve Chardonnay | | $150.00 | $2,100.00 |
| 14 | | case | Solange Emile's Grand Cuvee California Champagne | | $85.00 | $1,190.00 |
| | | | | | | |

|  |  |
|---|---|
| Subtotal | $5,390.00 |
| Tax | |
| Shipping | included |
| Balance Due | $5,390.00 |

✶

✶ *Chardonnay, Merlot only.*

Je soussigné Madame DITER Marie

demeurant 42 rue de Ponthierry 77310 Bocnie le Roi

France.

Tous les mois, j'envoie de l'argent à ma fille

· Solange CHADON demeurant à Philadelphie

P.a  19143   U.S.a.

Je lui paie ses factures, et l'achat de sa maison à

Los angeles pour une somme totale de 40.000 $ - 09/2

Fait le 25 juillet 2007

M. Diter

EX0013 A "E"

1 cpa
payroll company

Turn over

2 shifts

2 shifts of staff

and then the studios

Investment and breakdown of expenses and profit and cash flow

| | | |
|---|---|---|
| Rental of the truck | = $1600 | monthly |
| Cook n1 | =$2000 | |
| Cook n2 | =$2000 | |
| | + bonus for incentive | |
| Staff person buying food,inv. | =$3000 | |
| Marketing,operative manager | =$4000 | |
| Bookkeeping | =$2000 | |
| CPA (tax return,financial statement) | =$1000 | |
| Licence | =$300 | |
| Permit | =$300 | |
| Payroll | =$300 | |
| Uniform | =$200 | |
| Supplies (plates w logo ect..) (menus ect…) | =$500 | |
| food,beverage | =$30,000 | |

EXHIBIT "B" (3 pgs)

liability.....................................$ 500

roughly average per month

figures for one truck double for 2 trucks

serving 2 shifts a day

per week

average $5.75  by 1000 =$5750

average $12  by 1000 =$12,000

average $3 by 1000 =$ 3000

average $2 by 1000= $2000

average $22 by 200 =$ 4400
—————————
  total per week $26,150        gross

per month  per truck $26,150 by 4 weeks = $104,600

expenses monthly average  $47,700

gross  less expenses = $104,600 - $47,700= $56,900 in the clear

$56,900 by 2 trucks monthly average = a total pure profit of $ 113,800 monthly

the sales includes 2 shift daily + catering

The reason I try to demonstrate it can increase tremendously the income of debtor

Into the plan.

The debtor is studying all the possibilities of investment to start solange low carb gourmet on wheels.

The debtor put in the plan that the debtor will start on January 2008,but the debtor

Is going to see if with the approval of the court and the study of the cost analysis,

The debtor can start late fall 2007.

When the debtor starts the solange low carb business on wheels,the Honorable Court

And its Honorable Judge,the Trusdee and the creditors can have a full access of the

Operations and also taste the food.